**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VIACHESLAV IVANOV, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP,<br>in his official capacity as the President of the United States, *et. al.*,<br><br>Defendants. | Civil Case No. 26-915 (RJL) |
| VIKTORIIA CHERSAK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF STATE, *et. al.*,<br><br>Defendants. | Civil Case No. 26-968 (RJL) |
| NAMI SAITO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF STATE, *et. al.*,<br><br>Defendants. | Civil Case No. 26-2272 (RJL) |

**MEMORANDUM OPINION**

(August 25, 2026) [Dkt. #8, 16, 18, 21, 26, 41][1]

These consolidated cases challenge three agency actions that have effectively halted the Diversity Visa ("DV") program: the U.S. Citizenship and Immigration Services' ("USCIS") December 19, 2025 directive placing on hold adjustment-of-status applications filed by DV selectees present in the United States ("the USCIS Pause"); the State Department's December 20, 2025 directive requiring consular officers to refuse DV visa applications under Section 221(g) of the Immigration and Nationality Act ("INA") ("the State DV Pause"); and the State Department's January 14, 2026 directive requiring consular officers to refuse under Section 221(g) of the INA immigrant visa applications filed by nationals of seventy-five countries ("the Public Charge Pause").

The stakes are unusually time-sensitive. Congress makes a limited number of diversity visas available each fiscal year and imposes an unforgiving deadline: a selectee who does not receive a visa by September 30 loses eligibility for that fiscal year. Plaintiffs contend that the Pauses unlawfully deprive them of individualized consideration and, if otherwise eligible, of the opportunity to obtain a visa before that deadline.

For the reasons set forth below, I find that the USCIS Pause and State DV Pause are unlawful under the Administrative Procedure Act ("APA"). Although the agencies identify important national security interests in vetting visa selectees, the administrative records do

[1] The bracketed docket citations identify the dispositive motions resolved by this memorandum opinion and accompanying order. Because the underlying actions were consolidated, the relevant motions appear on multiple dockets: plaintiffs' and defendants' cross-motions in *Ivanov* are docketed at Dkt. #21 and #26 in No. 26-cv-915; the cross-motions in *Chersak* are docketed at Dkt. #16 and #18 in No. 26-cv-968; and the operative motion and cross-motion in *Saito* are docketed at Dkt. #8 in No. 26-cv-2272 and Dkt. #41 in No. 26-cv-915.

not provide a reasoned explanation for the sweeping, categorical nature of the policies at issue. The Public Charge Pause is independently unlawful because it supplants Congress's required individualized public-charge determination with a nationality-based bar to visa issuance. The Government, on the other hand, is entitled to summary judgment on plaintiffs' claims for unlawful withholding, unreasonable delay, and mandamus relief, as well as the *Ivanov* plaintiffs' constitutional claims.

The Court will enjoin application of the three Pauses only as to the named plaintiffs in these actions and their derivative beneficiaries. To effectuate that party-specific relief, the State Department must, to the extent practicable, take reasonable steps to reconsider the applications of named plaintiffs and derivative beneficiaries refused solely pursuant to the State DV Pause or the Public Charge Pause. USCIS must resume ordinary adjudication of covered named plaintiffs' adjustment applications without applying the USCIS Pause.

Accordingly, plaintiffs' motions for summary judgment will be **GRANTED IN PART** and **DENIED IN PART**, and the Government's cross-motions will be **GRANTED IN PART** and **DENIED IN PART**.

## FACTUAL BACKGROUND

### I. Diversity Visa Program

The Diversity Visa ("DV") program makes up to 55,000 immigrant visas available each fiscal year to applicants from "low admission" countries, or countries with historically low levels of immigration into the United States. *See* 8 U.S.C. § 1151(e). The demand for diversity visas is much higher than the supply, so a "lottery" is used to randomly select individuals who may apply for a diversity visa. *Gomez v. Trump*, 485 F. Supp. 3d 145, 159

(D.D.C. 2020) ("Gomez I").

Registration for the DV lottery generally opens in early October for visas available the following year. *See Diversity Visa Instructions*, U.S. Dep't of State, https://perma.cc/9EAH-BCV9. During the registration window, individuals register for the lottery online. *See* 22 C.F.R. § 42.33(b). From the millions of online entries, approximately 100,000 "selectees" are randomly chosen. *See The Diversity Immigrant Visa Program*, Cong. Rsch. Serv. (Oct. 15, 2019), https://perma.cc/FY9U-ETFE. Selectees are not guaranteed a visa; they are only eligible to *apply* for a diversity visa during the specified year. *See Goodluck v. Biden*, 104 F.4th 920, 928 (D.C. Cir. 2024).

Selectees who are outside the United States submit Form DS-260 and complete consular processing through a U.S. embassy or consulate abroad. *See* 22 C.F.R. § 40.1(l)(2). Selectees who reside in the United States as nonimmigrants, or individuals lawfully admitted to the United States on a temporary basis, submit a Form I-485, which is reviewed by USCIS. *See I-485, Application to Register Permanent Residence or Adjust Status*, USCIS, https://perma.cc/R4PJ-KH83.

All selectees must then attend an in-person interview, which takes place at a U.S. embassy or consulate if they are applying from abroad, or through a USCIS office if they are lawfully adjusting status inside the United States. *See Almaqrami v. Pompeo*, 933 F.3d 774, 777 (D.C. Cir. 2019). After reviewing the selectee's application and conducting the appropriate interview, consular officers must then "issue the visa, refuse the visa under INA 212(a) or 221(g) or other applicable law or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa." 22 C.F.R. § 42.81(a).

Selectees "shall remain eligible to receive [a DV] visa only through the end of the specific fiscal year for which they were selected." 8 U.S.C. § 1154(a)(1)(I)(ii)(II). In other words, "when midnight strikes at the end of the fiscal year, those applicants without visas are out of luck." *Yung-Kai Lu v. Tillerson*, 292 F. Supp. 3d 276, 282 (D.D.C. 2018).

## II. Directives Affecting the Diversity Visa Program

Last year, several events prompted the Government to adopt measures that effectively stopped the issuance of diversity visas.[2] On December 13, 2025, a mass shooting occurred at Brown University, in which two students were killed. *See* USCIS CAR at 2; State CAR at 48. In the days that followed, authorities reported that the same individual was suspected of killing a Massachusetts Institute of Technology professor in Brookline, Massachusetts; that individual had obtained an immigrant visa through the DV program in 2017. State CAR at 48.

On December 19, 2025, then-Department of Homeland Security ("DHS") Secretary Kristi Noem issued Policy Memorandum PM-602-0193. *See* USCIS CAR at 1–4 (**"the USCIS Pause"**). Citing "the recent mass shooting at Brown University," the memorandum instructed USCIS personnel to:

> Place a hold on all pending adjustment of status . . . applications, for aliens who are applying to adjust to lawful permanent resident status under the Diversity Immigrant Visa (DV) Program pending a comprehensive review... [and to] [c]onduct a comprehensive review of all policies, procedures, and screening and vetting processes for adjustment of status . . . applications by aliens seeking adjustment of status under the DV Program.

[2] There are two certified administrative records at issue across the three cases; both are filed on the *Ivanov* docket, No. 26-cv-915. The USCIS Certified Administrative Record is attached as Exhibit A to the Ivanov Mot. [Dkt. #21-2], and will be referred to as the "USCIS CAR," and the State Department's Certified Administrative Record is attached as Exhibit B to the Ivanov Mot. [Dkt. #21-3], and will be referred to as the "State CAR."

USCIS CAR at 1 (cleaned up).

On December 20, 2025, Secretary of State Marco Rubio ("Secretary Rubio") issued a formal cable responding to the same event. *See* State CAR at 48–50 ("**the State DV Pause**"). Secretary Rubio instructed:

> [E]ffective immediately, consular officers [are] instructed to refuse under Section 221(g) of the Immigration and Nationality Act (INA) all Diversity immigrant (IV) visa applicants unless the applicant has already been refused under another applicable ground of ineligibility.

State CAR at 48. "A refusal under INA 221(g), is, legally, a refusal on a visa application, even if that refusal is eventually overcome." Dep't. of State, 9 Foreign Affairs Manual ("FAM") 302.1-8(B)(c). As such, the guidance effectively required officers to continue reviewing DV applications and interviewing DV candidates, but to ultimately refuse final visa issuance pursuant to the Pause. *Id.*

In accordance with the cable, on December 23, 2025, the State Department confirmed in an online post: "[e]ffective immediately, the Department of State has paused all visa issuances to diversity immigrant visa applicants." *See* Ex. B to Ivanov Compl. [Dkt. #1-4] at 1. The post reiterated that the Pause "is being taken in light of concerns raised by the shooting at Brown University and killing of an MIT professor suspected to have been committed by an individual admitted to the United States through the DV program." *Id.*

## III. The Public Charge Pause

In a separate action, the State Department adopted a broader policy affecting all immigrant visa processing for nationals of certain designated countries. *See* State CAR at

70–73 ("**the Public Charge Pause**"). On January 14, 2026, Secretary Rubio sent a cable to all diplomatic and consular posts noting:

> Effective January 21, consular officers must refuse under Section 221(g) of the Immigration and Nationality Act [] **all immigrant visa applicants** who have not been refused under another ground of ineligibility, if the applicant is a national of the following [seventy-five] countries…

State CAR at 70. Unlike the DV Pauses, the Public Charge Pause is not limited to diversity visa applicants; it applies to all immigrant visa processing for nationals of the designated countries.

In selecting countries for inclusion on this list, the State Department relied on public-assistance and welfare data from the Council of Economic Advisers ("CEA"). *See* State CAR at 51. An early version of Secretary Rubio's cable notes that "30 percent or more of immigrants from those countries use welfare." *Id.* The record also includes a table titled "Immigrant Welfare Recipient Rates by Country of Origin," which ranks the "Percent of immigrant households receiving assistance" by country. State CAR at 56–58.

Shortly after the cable was issued, on February 2, 2026, the State Department posted "Immigrant Visa Processing Updates for Nationalities at High Risk of U.S. Public Benefits Reliance." *See* Ex. C to Ivanov Compl. [Dkt. #1-5] at 1. The post noted, "[e]ffective January 21, 2026, the Department of State paused all visa issuances to immigrant visa applicants who are nationals" of the seventy-five listed countries. *Id.*

## PROCEDURAL BACKGROUND

This case consolidates three actions: *Ivanov v. Trump*, No. 26-cv-915, *Chersak v.*

*Dep't of State*, No. 26-cv-968, and *Saito v. Dep't of State*, No. 26-cv-2272.[3] The plaintiffs in each action are either selectees of the 2026 DV program, or beneficiaries of the selectees.

## I. *Ivanov v. Trump*

Plaintiffs in *Ivanov* ("the *Ivanov* plaintiffs") include 738 selectee families for the 2026 DV Program. Pls.' Compl. for Declaratory and Inj. Relief and Pet. for Writ of Mandamus ("Ivanov Compl.") [Dkt. #1] ¶ 104.[4] Of the 738 families, 65 families are already located within the United States and therefore seek "adjustment of status" through USCIS. *Id.* Of the 673 selectees located outside of the United States, 557 selectees are nationals of one of the seventy-five countries affected by the Public Charge Pause. *Id.*

On March 15, 2026, the *Ivanov* plaintiffs filed suit against President Donald Trump, White House Deputy Chief of Staff for Policy Stephen Miller, Secretary Rubio, Director of USCIS Joseph B. Edlow, DHS Secretary Markwayne Mullin, and Attorney General

[3] For ease of reference, the Court uses the following short forms and docket citations for the consolidated actions. All docket citations to filings in *Ivanov* refer to No. 26-cv-915, docket citations to filings in *Chersak* refer to No. 26-cv-968, and docket citations to filings in *Saito* refer to No. 26-cv-2272 unless otherwise noted.

In *Ivanov*, the Court refers to Pls.' Mot. for Summ. J. as the "Ivanov Mot." [Dkt. #21], Pls.' Mem. in Supp. of Mot. for Summ. J. as the "Ivanov Mem." [Dkt. #21-1], Defs.' Combined Opp'n to Pls.' Mot. for Summ. J. and Cross-Mot. to Dismiss and for Summ. J. as the "Ivanov Opp'n/Cross-Mot." [Dkt. #26-1], Pls.' Mem. in Supp. of Mot. for Summ. J. [Dkt. #27] as the "Ivanov Mem. II," Pls.' Opp'n to Defs.' Cross-Mot. to Dismiss and for Summ. J. as the "Ivanov Opp'n to Cross-Mot." [Dkt. #30], and Defs.' Reply in Further Supp. of Cross-Mot. to Dismiss and for Summ. J. as the "Ivanov Reply in Supp. of Cross-Mot." [Dkt. #33].

In *Chersak*, the Court refers to Pls.' Mot. for Summ. J. as the "Chersak Mot." [Dkt. #16], Pls.' Mem. in Supp. of Mot. for Summ. J. as the "Chersak Mem." [Dkt. #16-1], Defs.' Combined Opp'n to Pls.' Mot. for Summ. J. and Cross-Mot. to Dismiss and for Summ. J. as the "Chersak Opp'n/Cross-Mot." [Dkt. #18], Pls.' Reply in Supp. of Mot. for Summ. J. and Combined Mem. in Opp'n to Defs.' Cross-Mots. to Dismiss and for Summ. J. as the "Chersak Reply" [Dkt. #21], and Defs.' Reply in Further Supp. of Cross-Mot. to Dismiss and for Summ. J. as the "Chersak Reply in Supp. of Cross-Mot." [Dkt. #24].

In *Saito*, the Court refers to Pls.' Mot. for a Prelim. Inj. as the "Saito Mot." [Dkt. #8]. After consolidation, *Ivanov* became the lead case, the *Saito* preliminary injunction motion was converted to a motion for summary judgment, and the following additional briefs were filed in No. 26-cv-915: Defs.' Combined Opp'n to Pls.' Mot. for Summ. J. ("Saito Opp'n/Cross-Mot.") [Dkt. #41], Pls.' Reply in Supp. of Mot. for Summ. J. and Opp'n to Defs.' Cross-Mot. for Summ. J. ("Saito Reply") [Dkt. #43], and Defs.' Reply in Further Supp. of Cross-Mot. for Summ. J. ("Saito Reply in Supp. of Cross-Mot.") [Dkt. #48].

[4] The docket numbers referenced in this section refer to filings in No. 26-cv-915.

Todd Blanche ("the Government").[5] *See* Ivanov Compl. The *Ivanov* plaintiffs originally moved for a preliminary injunction. *See* Mot. for. Prelim. Inj. [Dkt. #11]. Following a status conference, the Court denied the preliminary injunction motion as moot and instead adopted a summary judgment briefing schedule. *See* Min. Orders (Mar. 31, 2026).[6] On April 18, 2026, plaintiffs filed their first motion for summary judgment, *see* Ivanov Mot., and the Government cross-moved for summary judgment on May 1, 2026, *see* Ivanov Opp'n/Cross-Mot.

The *Ivanov* plaintiffs assert claims arising under the Constitution, the APA, and the Mandamus Act. Plaintiffs allege that the Pauses violate separation-of-powers principles, the nondelegation and major questions doctrines, and the adjustment-of-status plaintiffs' equal protection and due process rights. *See* Ivanov Compl. ¶¶ 183–88, 253–67. They further contend that the Pauses are arbitrary, capricious, an abuse of discretion, and otherwise contrary to law under 5 U.S.C. § 706(2)(A), *id.* ¶¶ 200–11; that the Public Charge Pause violates the INA's nondiscrimination clause, *id.* ¶¶ 212–17; and that the Pauses were imposed without required notice-and-comment procedures, in violation of 5 U.S.C. § 706(2)(D), *id.* ¶¶ 218–22. Plaintiffs also allege that the Government unlawfully withheld or unreasonably delayed mandatory visa adjudications under 5 U.S.C. §§ 555(b) and

---

[5] The complaint originally named Kristi Noem and Pam Bondi as Secretary of Homeland Security and Attorney General, respectively, but both have since been replaced. Secretary of Homeland Security Markwayne Mullin and Attorney General Todd Blanche are automatically substituted for their predecessors. *See* Fed. R. Civ. P. 25(d).

[6] The *Ivanov* plaintiffs originally filed this case as "related" to *Storie v. Trump*, No. 26-cv-567. *See* Notice of Related Case [Dkt. #2]. While *Storie* similarly implicated the Public Charge Pause, Judge Ali found the two cases "involve distinct sets of plaintiffs, who have applied for different immigration benefits, each of which is governed by a statutory and regulatory regime." *See* Order [Dkt. #22] at 3. Before the case was internally reassigned to this Court, Judge Ali adopted the governing briefing schedule for summary judgment.

706(1), and seek mandamus relief, *id.* ¶¶ 223–52, 282–96. Finally, plaintiffs challenge the Government's failure to open the 2027 DV program.[7] *Id.* ¶¶ 268–81.

## II. *Chersak v. State*

Plaintiffs in *Chersak* ("the *Chersak* plaintiffs") include 137 DV selectees, of which seventy-two selectees are from countries implicated by the Public Charge Pause.[8] *See* First Am. Compl. for Declaratory and Inj. Relief ("Chersak Compl.") [Dkt. #12] ¶¶ 1–137; Chersak Mem. at 25.[9] The *Chersak* plaintiffs originally filed suit against Secretary Rubio and the State Department on March 20, 2026, and filed an amended complaint on March 27, 2026. *See* Chersak Compl.[10]

The plaintiffs filed their first motion for preliminary injunction or summary judgment in the alternative on March 27, 2026. *See* Mot. for Prelim. Inj. or Summ. J. [Dkt. #13]. The Court adopted an expedited schedule for summary judgment, Min. Order (Apr. 9, 2026), and denied the preliminary injunction motion as moot, Min. Order (Apr. 20, 2026). The *Chersak* plaintiffs filed a renewed motion for summary judgment on April 17, 2026, *see* Chersak Mot., and the Government cross-moved for summary judgment and to dismiss the claims on May 1, 2026, *see* Chersak Opp'n/Cross-Mot.

---

[7] The *Ivanov* plaintiffs state that the "scope" of their summary judgment motion does not include the "allegations in Count Nine regarding Defendants' failure to administer the DV-2027 program." Ivanov Mem. at 1 n.1. However, because the Government moved to dismiss Count Nine, *see* Ivanov Opp'n/Cross-Mot. at 8–10, it is appropriate for the Court to consider that claim here.

[8] The docket numbers referenced in this section refer to filings in No. 26-cv-968 unless otherwise noted.

[9] The original lead plaintiff in this case was Maximilian Leicht, and the case was styled *Leicht v. Dep't of State*. On March 24, 2026, plaintiffs voluntarily dismissed Mr. Leicht because he was already a plaintiff in another suit raising similar issues, and the case was renamed *Chersak v. Dep't of State*. *See* Notice of Voluntary Dismissal [Dkt. #7].

[10] The *Chersak* matter was originally filed as a related case to *Ivanov* and was assigned to Judge Ali. *See* Notice of Related Case [Dkt. #4]. When Judge Ali reassigned the *Ivanov* matter, the *Chersak* matter was also moved to this Court. *See* Order [Dkt. #17].

The *Chersak* plaintiffs move for summary judgment on each of their four claims, all of which overlap with the *Ivanov* claims. *See* Chersak's Mem. Specifically, they challenge: (1) the USCIS Pause and the State DV Pause as arbitrary and capricious and contrary to law, Chersak Compl. ¶¶ 215–21; (2) the Government's failure to conduct notice-and-comment rulemaking for the Pauses, *id.* ¶¶ 222–37; (3) the Public Charge Pause as arbitrary and capricious, *id.* ¶¶ 238–59; and (4) the Government's "refusal to act" as agency action unlawfully withheld under 5 U.S.C. § 706(1), *id.* ¶¶ 260–68.

### III. *Saito v. State*

Plaintiffs in *Saito* ("the *Saito* plaintiffs") include 277 plaintiffs who are selectees for the 2026 DV lottery, of which ninety-eight are also subject to the Public Charge Pause.[11] *See* First Am. Compl. for Declaratory & Inj. Relief ("Saito Compl.") [Dkt. #7] ¶¶ 1–277; Saito Mot. at 22 n.14. The *Saito* plaintiffs originally filed suit on June 26, 2026, and shortly thereafter moved for a preliminary injunction on July 6, 2026. *See* Saito Mot.

The *Saito* plaintiffs allege four claims that overlap with the *Chersak* plaintiffs' claims, namely that: (1) the DV Pauses constituted unlawful agency action under 5 U.S.C. § 706(2)(A), Saito Compl. ¶¶ 351–57; (2) the Government failed to provide notice-and-comment rulemaking for the Pauses, *id.* ¶¶ 358–73; (3) the DV Pauses amount to unlawful withholding of plaintiffs' mandatory right to have their visas reviewed and adjudicated, *id.* ¶¶ 374–82; and (4) the Public Charge Pause amounts to unlawful withholding, *id.* ¶¶ 383–91.

[11] The docket numbers referenced in this section refer to filings in No. 26-cv-2272 unless otherwise noted.

After providing notice to the parties, the Court converted the *Saito* preliminary injunction motion to summary judgment. *See* Min. Order (July 13, 2026). The Court then consolidated the *Ivanov*, *Chersak*, and *Saito* actions on July 20, 2026. *See* Min. Order (July 20, 2026). The motions are now ripe for review.

## LEGAL STANDARD

The *Ivanov*, *Chersak*, and *Saito* plaintiffs have moved for summary judgment, while the Government has cross-moved for summary judgment and moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

A Rule 12(b)(6) motion "tests the legal sufficiency of a plaintiff's complaint." *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017). To survive, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In contrast, a Rule 12(b)(1) motion tests subject-matter jurisdiction. "'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Plaintiffs bear the burden of demonstrating the Court's subject matter jurisdiction over the claims at issue. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, each party receives the benefit of favorable factual inferences for purposes of the other party's motion. *See N.S.*

*ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010).

## ANALYSIS

## I. Preliminary Issues

Before turning to the merits of plaintiffs' challenges, I must resolve several threshold issues. First, I consider whether plaintiffs have established Article III standing to seek judicial relief. I then address the Government's related arguments that the challenged Pauses are not subject to review under the APA: first, because they are committed to agency discretion by law, and second, because they do not constitute final agency action.[12]

### a. Standing

#### i. 2026 DV Selectee Individuals and Family Members

Because "there is no justiciable case or controversy unless the plaintiff has standing," *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017), I begin with that analysis. With one exception discussed below, standing is generally uncontested and readily

[12] One additional preliminary issue warrants attention: who are the proper defendants in this action? All parties agree that Secretary Rubio, the State Department, and DHS Secretary Mullin are proper defendants. The *Ivanov* plaintiffs also name President Trump, Stephen Miller, and Attorney General Blanche, and the Government moves to dismiss these three as "wrongly named." *See* Ivanov Opp'n/Cross-Mot. at 11. The Court grants that request as to President Trump and Mr. Miller but denies it as to Attorney General Blanche. With respect to President Trump, plaintiffs allege he is "implicated in the creation and implementation" of the policies. Ivanov Mem. II at 3. However, where relief is available through "injunctive relief against subordinate officials," there is no need to retain the President as a defendant. *Haitian Bridge All. v. Biden*, 2026 WL 627405, at *13 (D.D.C. Mar. 6, 2026). Here, relief can be granted through action against the Secretary of State, so the President should be dismissed. As to Mr. Miller, plaintiffs claim that he "exercises substantial authority" over homeland security policy. Ivanov Mem. II at 3. But, that claim rests on conclusory assertions without evidence showing he actually has authority to direct USCIS adjudications. *See Twombly*, 550 U.S. at 555 (the pleading must contain more than "a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.") (cleaned up). By contrast, plaintiffs plausibly allege that Attorney General Blanche is a proper defendant. The INA explicitly grants the Attorney General authority to adjust aliens' status, *see* 8 U.S.C. § 1255(a), and the challenged USCIS Pause affects "adjustment of status" applications within that authority. Accordingly, there is a concrete legal basis to retain Attorney General Blanche as a defendant.

established as to the 2026 DV selectees and their family members in each case.

"To establish standing, the plaintiff[s] must show (1) [they] ha[ve] suffered a concrete and particularized injury (2) that is fairly traceable to the challenged action[s] of the defendant[s] and (3) that is likely to be redressed by a favorable decision." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 376–77 (D.C. Cir. 2017) (internal quotation marks omitted). Plaintiffs meet each element here.

The *Ivanov*, *Chersak*, and *Saito* plaintiffs allege "procedural injuries," stemming from the Government's alleged withholding of plaintiffs' right to visa adjudication under 8 U.S.C. § 1202(b).[13] *See* Ivanov Mem. at 17–19; Chersak Mem. at 16; Saito Mot. at 15. Section 1202(b) provides that, "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b). The plaintiffs argue that the USCIS Pause and State DV Pause have prevented plaintiffs from obtaining lawful individualized consideration of their visa applications. *See* Ivanov Mem. at 18. Courts in this Circuit routinely recognize such procedural injuries where plaintiffs claim withholding of a statutorily mandated right to visa adjudication and a concrete interest in obtaining that visa before a certain deadline. *See, e.g.*, *Gomez I,* 485 F. Supp. 3d at 171.

Causation is also readily satisfied. As the *Ivanov* plaintiffs explained, the Pauses at issue "directly lead to the present reality that Plaintiffs, without the Court's intervention,

[13] In determining whether plaintiffs have standing, the Court must assume plaintiffs possess a mandatory, non-discretionary right of review and adjudication of their visa applications. *See Estate of Boyland v. U.S. Dep't of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019) ("[W]hen considering whether a plaintiff has Article III standing, a federal court must assume, *arguendo*, the merits of his or her legal claim.").

will never have their applications lawfully adjudicated and issued to eligible individuals before the FY deadline." Ivanov Mem. at 19–20. The *Chersak* and *Saito* plaintiffs likewise submitted declarations describing the uncertainty and other harms caused by the Pauses. *See* Chersak Mem. at 14; Saito Mot. at 13. Because the alleged injuries flow directly from USCIS's categorical hold and the State Department's categorical refusal policies, the plaintiffs have adequately established traceability. *See Kinsley v. Blinken*, 2021 WL 4551907, at *7 (D.D.C. Oct. 5, 2021) (finding an injury to be "fairly traceable" where the challenged actions "made it far more difficult for Plaintiffs to have their visas adjudicated.").

Redressability is likewise present.[14] Lifting the Pauses would not guarantee the issuance of visas for plaintiffs, but it would restore the opportunity for timely adjudication. *See Gomez I*, 485 F. Supp. 3d at 172. Furthermore, because the plaintiffs assert procedural injuries, they are subject to a "relaxed redressability requirement," and need only show that their interests *could* be better protected. *See Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 185 (D.C. Cir. 2017). Accordingly, the 2026 DV selectees and their derivative family

[14] The Government raises two additional threshold objections in *Saito*, one of which relates to redressability. First, the Government argues that the plaintiffs subject to the Public Charge Pause cannot obtain meaningful relief because the Amended Complaint supposedly challenges only the DV Pauses—not the separate Public Charge Pause. On that premise, the Government contends that even vacatur of the DV Pauses would leave the Public Charge Pause intact, preventing visa issuance for those plaintiffs. *See* Saito Opp'n/Cross-Mot. at 7–8. But the Public Charge Pause is properly before the Court in *Saito*. The Amended Complaint alleges that the Public Charge Pause creates an unauthorized nationality-based ground of ineligibility, lacks statutory authority, predetermines refusals without individualized review, and violates 8 U.S.C. § 1152(a)(1)(A). *See* Saito Compl. ¶¶ 313, 316–17, 320, 388–91. Thus, an order setting aside the Pauses and requiring lawful, individualized adjudication would remove the barrier alleged to injure these plaintiffs. Second, the Government contends that merits relief is premature absent an administrative record. Saito Opp'n/Cross-Mot. at 9. However, the certified records have already been filed in the consolidated lead case, *see* USCIS CAR & State CAR, so there is no basis to defer resolution of plaintiffs' claims.

members have standing to challenge the Pauses.[15]

### ii. 2027 DV Program

The standing analysis differs, however, with respect to the *Ivanov* plaintiffs' challenge to the delayed opening of the 2027 DV program. The plaintiffs claim the Government has failed to timely begin the registration period for the 2027 DV program, thereby depriving plaintiffs of a "congressionally created opportunity to re-apply." Ivanov Opp'n to Cross-Mot. at 7. The Government contends that plaintiffs' claim rests on an impermissibly speculative future injury. *See* Ivanov Opp'n/Cross-Mot. at 8. I agree with the Government.

Any alleged harm to plaintiffs—who are 2026 DV selectees—depends on a series of contingencies that have not yet occurred, including whether plaintiffs will apply for the DV program in 2027 and whether they will be selected. At this stage, that asserted injury is too conjectural to satisfy Article III. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasizing the "threatened injury" must be "*certainly impending* to constitute injury in fact," and that "[a]llegations of *possible* future injury" are insufficient.). Because the *Ivanov* plaintiffs lack standing to challenge the 2027 DV program, I will grant the Government's motion to dismiss Count Nine of the *Ivanov* complaint.

[15] One minor standing issue remains with respect to the *Ivanov* 2026 DV selectees. The Government argues that the plaintiffs whose 2026 DV case numbers have not yet become "current" under the Visa Bulletin lack standing because they have not yet reached the point at which adjudication would ordinarily occur. *See* Ivanov Opp'n/Cross-Mot. at 11. The Visa Bulletin is the State Department's monthly chart of visa availability and cutoff dates, which determines when a DV applicant's case number is eligible for final processing. *Id.* The Government's argument is unpersuasive. Plaintiffs' alleged injuries do not depend on whether their case numbers are "current" at any given moment; rather, their injuries arise from the agencies' categorical refusal to issue any DV visas during the Pauses, thereby affecting plaintiffs' non-discretionary right of review. *See Gomez I*, 485 F. Supp. 3d at 171. As such, all the *Ivanov* 2026 DV selectees have a legally protected interest and a concrete harm sufficient to satisfy standing requirements.

**b. Subject to Agency Discretion**

The Government argues that the Pauses are unreviewable under the APA because they are "committed to agency discretion by law." *See* Ivanov Opp'n/Cross-Mot. at 15–16; Chersak Opp'n/Cross-Mot. at 6; Saito Opp'n/Cross-Mot. at 10. I disagree.

The Court begins with the "basic presumption of judicial review for one suffering legal wrong because of agency action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16–17 (2020) (cleaned up). The exception for matters "committed to agency discretion by law" is a narrow one, limited "to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (internal quotation marks omitted). The question, then, is not whether the agencies enjoy discretion in immigration matters—they plainly do—but whether Congress has left the Court with no judicially manageable standards to evaluate the challenged Pauses.

First, with respect to the USCIS Pause, the Government asserts that USCIS "has codified discretion when it comes to adjustment of status applications," and that this discretion extends to "pace of adjudication claims." Ivanov Opp'n/Cross-Mot. at 15. The Government principally relies on Section 1255(a), which provides that the Secretary of Homeland Security may, "in his discretion and under such regulations as he may prescribe," adjust a noncitizen's status to that of a lawful permanent resident. 8 U.S.C. § 1255(a). USCIS, however, has promulgated numerous regulations that cabin and govern its discretion. *See, e.g.*, 8 C.F.R. § 245.2(a)(5)(i) (requiring that applicants be notified of

the director's adjustment decision and provided with any reasons for the denial). Indeed, the regulations contemplate that "USCIS will accept, review, and adjudicate adjustment of status applications," under the governing statutory and regulatory framework. *Doe v. Trump*, 2026 WL 1170971, at *11 (D. Mass. Apr. 30, 2026). Thus, a directive purportedly halting that review for an entire category of applications does not render "meaningful judicial review [] impossible," *Drake v. F.A.A.*, 291 F.3d 59, 70 (D.C. Cir. 2002), as the Court may assess whether USCIS is adhering to its own regulatory process that governs the consideration and adjudication of such applications.

The Government separately argues that the challenged State Department policies merely reflect the discretion Congress afforded the agency in processing immigration applications.[16] *See* Ivanov Opp'n/Cross-Mot. at 16; Chersak Opp'n/Cross-Mot. at 6; Saito Opp'n/Cross-Mot. at 10. As noted earlier, Congress directs that "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b). The Department retains discretion over the manner and substance of an individual officer's review. However, plaintiffs challenge agency-wide directives that require consular officers to *refuse* under Section 221(g) all DV applicants, or all covered applicants under the Public Charge Pause, without regard to the applicant-specific factors that ordinarily govern visa issuance. The INA supplies meaningful standards against which to assess those directives,

[16] The Government's briefing is not clear as to whether it believes the Public Charge Pause, the State DV Pause, or both State Department policies are subject to agency discretion. In each case, the Government refers generally to the State Department's "guidance documents." Ivanov Opp'n/Cross-Mot. at 16; Chersak Opp'n/Cross-Mot. at 6; Saito Opp'n/Cross-Mot. at 10. Because the briefing uses the plural term "documents," the most natural reading is that it encompasses both the State DV Pause and the Public Charge Pause. However, the Government's reliance on *Pourshakouri v. Pompeo*, 2021 WL 3552199, at *9 n.11 (D.D.C. Aug. 11, 2021), which addresses the need to afford "significant discretion" in the "national security" context, suggests that the State DV Pause may be the more direct focus. For completeness, this discussion addresses both Pauses.

including the provisions governing visa refusals (8 U.S.C. § 1201(g)), public-charge determinations (8 U.S.C. § 1182(a)(4)), and nationality-based discrimination in immigrant visa issuance (8 U.S.C. § 1152(a)(1)(A)). The challenged State Department policies are therefore not committed to agency discretion by law. *See also Gomez v. Biden*, 2021 WL 3663535, at *17 (D.D.C. Aug. 17, 2021), *rev'd and remanded on other grounds sub nom. Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024).

**c. Final Agency Action**

Next, the Government contends that the Pauses do not constitute "final agency action," and are therefore not subject to judicial review. *See* Ivanov Opp'n/Cross-Mot. at 17–19; Chersak Opp'n/Cross-Mot. at 7–9; Saito Opp'n/Cross-Mot. at 11–13. In assessing finality, courts apply the two-part test articulated in *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). First, "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (cleaned up).

With respect to the first *Bennett* prong, the Government claims "the Pauses at issue are an interim policy and subject to revision." Ivanov Reply in Supp. of Cross-Mot. at 3. But, "if an agency's indication of an intent to reconsider an interim (or other) action sufficed to render the action non-final, agencies could evade judicial review of their actions." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 79 (D.C. Cir. 2020). Here, the USCIS Pause states that, "[t]his hold will remain in effect until lifted or modified by the USCIS Director." USCIS CAR at 3. The State DV Pause promised additional guidance

within ninety days of the issuance of the policy, *see* State CAR at 49, but now more than 200 days have passed without further updates. The Public Charge Pause provides no indication of when the Department will complete its "full review of all policies, regulations, and guidance." State CAR at 71. Accordingly, the Pauses are neither "tentative or interlocutory," but instead reflect a present and operative agency position. *Nat. Res. Def. Council*, 955 F.3d at 78.

On the second *Bennett* prong, whether "legal consequences will flow" from the challenged actions, the Government argues that the Pauses "do not purport to alter any applicant's legal status, determine admissibility, or even compel a particular outcome in any individual case." Ivanov Opp'n/Cross-Mot. at 17. Instead, the Pauses "merely guide how officers conduct adjudications within an existing statutory framework." *Id.* at 18. But here, the State DV and Public Charge Pauses plainly "compel" a particular outcome. Both cables instruct consular officers to "refuse under Section 221(g)" all DV visa applicants and applicants from the listed seventy-five countries unless the applicant has already been refused under another applicable ground of ineligibility.[17] State CAR at 48, 70. Because "a refusal under INA 221(g) is, legally, a refusal on a visa application," 9 FAM 302.1-8(B)(c), it strains credulity to suggest that such directives do not "compel" a particular outcome. The USCIS Pause likewise carries legal consequences because it binds USCIS adjudicators to place covered applications on hold, thereby preventing ordinary

[17] The *Saito* plaintiffs submitted examples showing consular officers implementing this directive and refusing applications under Section 221(g) specifically because of the "Diversity Visa Issuance Pause." *See* Ex. A to Saito Reply [Dkt. #43-3] at 6.

consideration and potentially precluding relief before September 30.[18]

## II. State DV Pause and USCIS Pause

Having concluded that the Pauses are reviewable agency actions, I turn now to the merits. Plaintiffs contend that the State DV Pause and USCIS Pause are arbitrary and capricious. *See* Ivanov Compl. ¶¶ 200–11 (Count III); Chersak Compl. ¶¶ 215–21 (Count I); Saito Compl. ¶¶ 351–57 (Count I). I agree, for three reasons: neither the memoranda nor the administrative records provide a reasoned explanation for the breadth of the State Department's categorical refusal policy and USCIS's categorical hold; the agencies fail to meaningfully consider relevant alternatives; and the agencies disregard substantial reliance interests created by the prior operation of the DV program.

Under the APA, reviewing courts must "hold unlawful and set aside agency action" that is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A). The Court begins with the familiar premise that review under Section 706(2)(A) is "deferential." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Indeed, the Court may not "substitute its own policy judgment for that of the agency." *Id.* That deference is pronounced in immigration matters, where "decisions regarding the prioritization and

[18] The Government cites several cases in which courts found that challenged "agency policies" were not final agency action. But those cases are distinguishable because the relevant adjudicators retained ultimate discretion. *See Nat'l Immig. Project of Nat'l Laws. Guild v. EOIR*, 456 F. Supp. 3d 16, 31 (D.D.C. 2020) (finding ICE policies were not final where they were "implemented on a facility-by-facility and individual-by-individual basis"); *RCM Techs., Inc. v. Dep't of Homeland Sec.*, 614 F. Supp. 2d 39, 46 (D.D.C. 2009) (finding the challenged policy was not final where it merely gave adjudicators "permission" to consider certain factors, rather than requiring them to act in a particular way). Here, the challenged Pauses do not afford USCIS or State Department adjudicators comparable discretion. The Government also relies on cases in which challenged actions were deemed to merely "clarify" existing duties. *See Del. Valley Reg'l Ctr., LLC v. Dep't of Homeland Sec.*, 106 F.4th 1195, 1204–05 (D.C. Cir. 2024) (Q&A and Policy Manual merely "clarif[y] existing duties"); *Avagyan v. Blinken*, 2022 WL 19762411, at *6 (D.D.C. 2022) (challenged provisions "simply facilitate[d]" the agency's fulfillment of its existing obligations). In contrast, the Pauses at issue here do not clarify preexisting requirements; they impose new refusal directives that alter how visas are issued.

processing of visa applications . . . implicate weighty concerns of foreign policy and national security." *Goodluck*, 104 F.4th at 928. But deference is not blind acceptance. The agency must still engage in "reasoned decisionmaking." *Fisher v. Pension Benefit Guar. Corp.*, 994 F.3d 664, 671 (D.C. Cir. 2021). Unfortunately, they did not do so here!

The State DV Pause was adopted "in light of concerns raised by the [Brown and MIT] shooting[s]," to ensure that the State Department can "adequately establish the identity of aliens who are selected through the DV entry lottery." State CAR at 49. However, the record does not explain why that categorical refusal policy is a reasonable response to the Department's identity-verification and vetting concerns. The record identifies no particular defect in the DV program's existing screening procedures, no connection between the cited incident and any vetting gap affecting current selectees, and no explanation for treating all DV applicants alike regardless of their individual circumstances. *See Ascendium Educ. Sols., Inc. v. Cardona*, 78 F.4th 470, 484 (D.C. Cir. 2023) (emphasizing the need for a "rational connection between the facts found and the choice made."). Ultimately, the State DV Pause treats the criminal conduct of one former DV beneficiary as grounds to refuse visas for thousands of applicants across numerous countries, despite the individualized screening process already established by Congress. *See Doe v. Trump*, 2026 WL 1170971, at *17 (D. Mass. Apr. 30, 2026).

That same flaw appears in the USCIS Pause. The Government may reasonably seek to ensure that individuals who pose a danger do not enter—or, if already present, remain in—the United States. But the administrative record does not explain why categorically suspending all pending DV adjustment applications is a rational means of advancing that

interest. As one court recently observed when assessing a similar adjustment-of-status pause, "the logic of screening foreign nationals who are outside of the country . . . makes no sense when applied in an undifferentiated manner to the Plaintiffs, who are already in the country." *Doe v. Edlow*, 2026 WL 1945085, at *26 (S.D. Ohio July 6, 2026) (internal quotation marks omitted).

The absence of any limiting principle or consideration of any alternatives is also significant. The Pauses identify no end date,[19] and the administrative records provide no evidence regarding the existing "screening vulnerabilities." While agencies need not select the narrowest available measure, the administrative records do not explain why less drastic alternatives would not have addressed the Government's concerns while preserving the ordinary operation of this congressionally-established program. *See Stewart v. Azar*, 313 F. Supp. 3d 237, 264 (D.D.C. 2018) (noting the Court "cannot infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals.").

Finally, there is no evidence that the agencies considered any of the reliance interests at stake for the DV selectees. When an agency changes course, it must consider whether the prior policy "engendered serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). Before the Pauses, selectees could submit applications, appear for interviews, and be eligible to receive individualized

[19] The State DV Pause notes that "additional guidance is planned [by separate cable] (within 90 days) for processing DV applicants, specifically any updated enhanced vetting or screening measures that may be required to determine identity and eligibility for a visa." State CAR at 49–50. However, more than ninety days have passed, and no further guidance has been issued. The USCIS Pause notes, "[t]his hold will remain in effect until lifted or modified by the USCIS Director, or at the direction of the Secretary, through a subsequent memorandum." USCIS CAR at 3.

determinations of their eligibility during the applicable fiscal year. While selection in the DV lottery does not entitle plaintiffs to a visa, plaintiffs allege—and the Government does not dispute—that they have expended substantial time and money in reliance on the established DV visa process. *See, e.g.*, Chersak Mem. at 14 (explaining that each named plaintiff had completed the required application steps or submitted the required documentation). The USCIS memorandum notes in passing that the agency has considered that this order "will result in delay to the adjudication of some pending applications," USCIS CAR at 4, but that acknowledgment is a far cry from thoughtful consideration of concrete reliance harms resulting from the USCIS hold and the State Department's categorical refusal policy.

## III. The Public Charge Pause

Plaintiffs also claim the Public Charge Pause is arbitrary and capricious.[20] *See* Ivanov Compl. ¶¶ 200–11 (Count III); Chersak Compl. ¶¶ 238–59 (Count III); Saito Compl. ¶¶ 388–91 (Count IV). At least three courts, including one in this district, have

[20] The *Ivanov* plaintiffs separately contend that the Public Charge Pause violates the INA's prohibition on nationality-based discrimination in immigrant visa issuance. *See* Ivanov Compl. ¶¶ 212–17 (Count IV); Ivanov Mem. at 26–29. I agree. Section 1152(a)(1)(A) provides that, "no person shall . . . be discriminated against in the issuance of an immigrant visa because of" the person's nationality. 8 U.S.C. § 1152(a)(1)(A). The Pause directs consular officers to refuse immigrant visas based on an applicant's nationality, including after the officer has determined through the ordinary course that the applicant is not likely to become a public charge. *See* State CAR at 70–71. That constitutes discrimination in visa issuance. Despite the Government's argument to the contrary, *see* Saito Opp'n/Cross-Mot. at 14, the Supreme Court's decision in *Trump v. Hawaii*, 585 U.S. 667 (2018), does not compel a different result. There, the Supreme Court held that Section 1152(a)(1)(A) did not limit the President's exercise of his separate authority under 8 U.S.C. § 1182(f) to suspend the *entry* of a class of noncitizens from certain countries upon finding their entry detrimental to the national interest. *Hawaii,* 585 U.S. at 695–96. The Court's conclusion rested on the distinction between *visa issuance* and *entry*, as well as on the President's invocation of Section 1182(f). *Id.* This case involves neither circumstance. The Public Charge Pause is an agency directive governing visa issuance; it does not purport to implement a Section 1182(f) presidential proclamation or make the required finding that entry of individuals from the listed countries would be detrimental to U.S. interests. *Compare* State CAR at 70–73 (the Public Charge Pause), *with* State CAR at 27–38 (State Department cable expressly invoking "Section 212(f) of the INA (8 U.S.C. 1182(f)") to implement entry restrictions). The Pause therefore violates Section 1152(a)(1)(A), and the *Ivanov* plaintiffs are also entitled to summary judgment on this issue.

already held the Public Charge Pause unlawful under the APA. *See Catholic Legal Immigr. Network, Inc. v. Rubio*, 2026 WL 2455099, at *17 (S.D.N.Y. Aug. 21, 2026); *De Moura Gomes v. Rubio*, 2026 WL 2212503, at *9 (D.D.C. July 31, 2026); *Ullah v. Lafave*, 2026 WL 1541774, at *10 (D. Mass. June 2, 2026). I reach the same conclusion for similar reasons. By requiring consular officers to refuse visas based on an applicant's nationality even after an individualized review determines that the applicant is unlikely to become a public charge, the Public Charge Pause departs from Congress's prescribed framework without a reasoned explanation.

The statute governing public-charge determinations *requires* an individualized assessment. Specifically, "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A). The statute further directs officers to consider each applicant's age, health, family status, assets, resources, financial status, education, and skills. 8 U.S.C. § 1182(a)(4)(B)(i)(I)–(V); *see also* 9 FAM 302.8-2(B)(1) (requiring consular officers to look at the "totality of the applicant's circumstances" in assessing whether they will become a public charge). Nothing in this framework prohibits the Department from considering reliable country-level data as one input relevant to an applicant's prospective likelihood of becoming a public charge. But even reliable data does not justify displacing the individualized determination Congress prescribed.

The Public Charge Pause instructs consular officers to determine, under ordinary procedures, whether an applicant is likely to become a public charge and therefore

ineligible under 8 U.S.C. § 1182(a)(4)(A). *See* State CAR at 71. But even if the officer determines the applicant is not ineligible on that ground, the officer must still refuse the applicant under Section 221(g). *Id.* at 72. The defect, therefore, is not the Department's consideration of country-level public-assistance data. It is the cable's command that nationality be dispositive of visa issuance even after the inquiry prescribed by statute does not find an applicant inadmissible on that ground.

The policy, subsequently, represents a significant change in course. Agencies are "free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (cleaned up). Here, the record contains only minimal discussion of why the referenced statistics justify replacing the existing individualized, statutory scheme mandated by Congress. *See* State CAR at 70–73. The memorandum does not explain why the ordinary public charge inquiry is insufficient, or why the agency could not continue to rely on individualized assessments while addressing any identified concerns.[21]

---

[21] Before turning to plaintiffs' remaining claims, I will address one final challenge to the validity of the Pauses themselves: plaintiffs' contention that the agencies adopted those policies without the required notice-and-comment procedures. *See* Ivanov Compl. ¶¶ 218–22 (Count V); Chersak Compl. ¶¶ 222–37 (Count II); Saito Compl. ¶¶ 358–73 (Count II). The APA generally requires notice-and-comment for substantive rules, *see* 5 U.S.C. § 553(b), but excepts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," *id.* § 553(b)(A). Interpretive rules lack the force of law and merely "advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995). Despite the Government's contention otherwise, the Pauses are not interpretive rules. As discussed earlier, the Pauses impose binding directives that determine whether adjudicators may issue visas or complete adjudication of covered adjustment applications. The State Department cables require consular officers to refuse covered applicants under Section 221(g), while the USCIS memorandum requires personnel to hold all covered adjustment applications. Those directives establish binding norms with legal consequences, rather than procedural rules governing the manner in which otherwise available adjudicatory discretion is exercised. *See Varniab v. Edlow*, 2026 WL 485490, at *20 (N.D. Cal. Feb. 20, 2026) (finding a similar USCIS hold to be a substantive rule subject to notice-and-comment procedures). The Government's alternative invocation of the foreign-affairs exception to the notice-and-comment requirements is equally unpersuasive. That exception is "narrowly construed" and "reluctantly countenanced," *State of N. J., Dep't*

## IV. Unlawful Withholding, Unreasonable Delay, Mandamus

In each case, plaintiffs allege that the Government has "unlawfully withheld" and "unreasonably delayed" their mandatory duty to adjudicate plaintiffs' visa applications. *See* Ivanov Compl. ¶¶ 223–52 (Count VI); Chersak Compl. ¶¶ 260–68 (Count IV); Saito Compl. ¶¶ 374–91 (Counts III & IV). The *Ivanov* plaintiffs also argue that this delay entitles them to separate relief under the Mandamus Act. *See* Ivanov Compl. ¶¶ 282–96 (Count X).

In cases challenging unreasonable agency delay, "[t]he D.C. Circuit has made clear that 'the standards for obtaining relief' under the Mandamus Act and the APA are 'essentially the same.'" *Al-Gharawy v. U.S. Dep't of Homeland Sec.*, 617 F. Supp. 3d 1, 17 (D.D.C. 2022) (quoting *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 659 n.6 (D.C. Cir. 2010)). Accordingly, when a plaintiff seeks to compel delayed agency action under both statutes, "those claims merge." *Al-Gharawy*, 617 F. Supp. 3d at 17. Under this fused analysis, a plaintiff "must allege that an agency has a clear non-discretionary duty to take a specific action and that the agency failed to take that action." *Sharifishourabi v. Blinken*, 2024 WL 3566226, at *5 (D.D.C. July 29, 2024).

That standard is not met here for any of the plaintiffs who have received a refusal under Section 221(g), because there is no further discrete action to compel. *See Karimova v. Abate*, 2024 WL 3517852, at *6 (D.C. Cir. July 24, 2024). Once a visa application has

---

*of Env't Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980), and the mere fact that a policy affects visa issuance does not establish the requisite direct connection to the conduct of foreign affairs, *see E.B. v. U.S. Dep't of State*, 583 F. Supp. 3d 58, 63, 66 (D.D.C. 2022). The Pauses are therefore procedurally invalid, and plaintiffs are entitled to summary judgment on their notice-and-comment claims.

been properly completed, consular officers have a mandatory duty to "issue the visa, refuse the visa under INA 212(a) or 221(g) or other applicable law or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa." 22 C.F.R. § 42.81(a). "A refusal under INA 221(g) is, legally, a refusal on a visa application, even if that refusal is eventually overcome." 9 FAM 302.1-8(B)(c); *see also Yaghoubnezhad v. Stufft*, 734 F. Supp. 3d 87, 94 (D.D.C. 2024). Thus, although issuing or refusing a final visa application is a mandatory agency action, that final action has already occurred for plaintiffs refused under Section 221(g).[22]

The remaining plaintiffs have not received final refusals or other final dispositions of their visa or adjustment applications. Their unreasonable-delay claims are governed by the six factors set out in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984) ("*TRAC*"):

> (1) the time agencies take to make decisions must be governed by a 'rule of reason'; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (quoting

---

[22] The Government separately contends that the doctrine of consular nonreviewability prohibits the plaintiffs who have been refused under Section 221(g) from seeking to compel a consular officer to act further on their applications. *See, e.g.*, Ivanov Opp'n/Cross-Mot. at 29–31. Because I find that those plaintiffs are foreclosed from bringing an unreasonable delay claim under *Karimova*, I need not address this alternative defense.

*TRAC*, 750 F.2d at 80).

Several *TRAC* factors favor plaintiffs. Under the third and fifth factors, respectively, plaintiffs have identified substantial personal and financial interests affected by the Pauses, and the DV program's September 30 deadline makes further delay particularly consequential. *See* Ivanov Mem. at 41–42; Chersak Reply at 12–13; Saito Reply at 17. The Government, to some extent, "concede[s] that hardship has been endured by Plaintiffs," Ivanov Reply in Supp. of Cross-Mot. at 10, and the numerous declarations filed throughout the three cases clearly detail the effects that these policies have had on plaintiffs' "welfare," *see, e.g.,* Ex. C to Ivanov Mot. [Dkt. #21-4] (plaintiff declarations detailing how the delays have endangered careers, livelihoods, and relationships).

Unfortunately for the plaintiffs, the remaining factors favor the Government. How so? The first two *TRAC* factors are "typically considered together," *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 317 (D.D.C. 2020), and focus on "the extent of and reasons for the agency delay," *Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807, 816 (D.C. Cir. 2024). On timing, the DV statute makes visas available only through the end of the relevant fiscal year. However, that date is an *eligibility* cutoff, not a timetable requiring the agencies to complete adjudication by a specified date. *See Babamuradova v. Blinken*, 633 F. Supp. 3d 1, 17 (D.D.C. 2022) (noting the DV statutory framework does not provide a "speed at which each individual application must be adjudicated.").

The fourth factor also favors the Government. "This factor often carries significant weight," and relief that would "simply 'reorder' a queue of applicants seeking adjudication is generally viewed as inappropriate." *Tate v. Pompeo*, 513 F. Supp. 3d 132, 149 (D.D.C.

2021) (quoting *In re Barr Labs., Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991)). Ordering the agencies to adjudicate the named plaintiffs first would "inevitably entail a judicial reordering of the Department's priorities." *Motevali v. Rubio*, 2025 WL 885116, at *8 (D.D.C. Mar. 21, 2025).

Finally, the sixth factor—whether there is any impropriety lurking behind agency lassitude—is contested. Plaintiffs claim the administrative record shows a "premeditated intent to eliminate the DV program," Chersak Reply at 13, and that the lack of "further guidance" on the issue constitutes "bad faith," Ivanov Mem. at 45. But the plaintiffs fail to cite to any "factual content that allows the court to draw the reasonable inference of any bad faith or impropriety that would sway this factor in Plaintiffs' favor." *Xiaobing Liu v. Blinken*, 544 F. Supp. 3d 1, 14 (D.D.C. 2021) (internal quotation marks omitted). As such, this factor is neutral at best.

Accordingly, plaintiffs have not established entitlement to relief on their claims for unlawful withholding, unreasonable delay, or mandamus, and the Government is entitled to summary judgment on those claims. That conclusion does not foreclose the distinct relief warranted by plaintiffs' successful merits challenges to the Pauses: rather than compel adjudication on a court-imposed timetable or reorder the agencies' priorities, the Court may enjoin the agencies from applying the unlawful policies to plaintiffs' applications and require any resulting processing to proceed in the ordinary course.

## V. Constitutional Claims

The *Ivanov* plaintiffs also bring several constitutional claims,[23] including two under the Fifth Amendment alleging that the agencies have discriminated against them on the basis of national origin, Ivanov Compl. ¶¶ 253–59 (Count VII), and deprived the plaintiffs of funds spent on the adjudication of their applications, *id.* ¶¶ 260–67 (Count VIII). Both claims fail.[24]

As to the Public Charge Pause, plaintiffs' equal protection claim fails. The challenged Public Charge Pause applies *only* to consular processing at U.S. embassies and consulates abroad, *see* State CAR at 70–73, and not to adjustment-of-status applicants within the United States. The Supreme Court has reiterated that "certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). Likewise, the

---

[23] The *Ivanov* plaintiffs also separately contend that the Pauses violate the Constitution's separation of powers and nondelegation doctrine, as well as the major questions doctrine. Ivanov Compl. ¶¶ 183–88 (Count I). Their briefing on this count was difficult to follow. *See* Ivanov Mem. at 22–24. In any event, plaintiffs have not established that the challenged actions exceed constitutional limits on Congress's delegation of immigration authority. Moreover, plaintiffs have not effectively demonstrated that the Pauses implicate the major questions doctrine, which is reserved for "extraordinary cases in which the history and the breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 700 (2022) (internal quotation marks omitted). Accordingly, I will grant summary judgment to the Government on Count One of the *Ivanov* complaint.

[24] The Government separately contends that 8 U.S.C. § 1252(a)(2)(B)(ii) precludes review of Counts Seven and Eight. *See* Ivanov Opp'n/Cross-Mot. at 13–15. Section 1252(a)(2)(B)(ii) strips jurisdiction over "any other decision or action" of the Secretary of Homeland Security for which the INA "specifie[s]" discretionary authority. 8 U.S.C. § 1252(a)(2)(B)(ii). The Government maintains that pausing final adjudication of DV-based adjustment of status applications lies within the Secretary's discretionary authority to grant or deny adjustment. Ivanov Opp'n/Cross-Mot. at 13. But that argument conflates unreviewable individual adjustment determinations with reviewable challenges to agency-wide policies governing such determinations. Courts in this Circuit have consistently held that Section 1252(a)(2)(B)(ii) does not bar claims contesting "the legality of policies and processes governing discretionary decisions under the INA." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 135 (D.D.C. 2018); *see also Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 630–31 (D.C. Cir. 2020). Other courts have likewise rejected efforts to invoke the provision to foreclose review of categorical immigration-policy decisions. *See Dorcas Int'l Inst. of Rhode Island v. U.S. Citizenship & Immigr. Servs.*, 2026 WL 1622708, at *13 (D.R.I. June 5, 2026) (collecting cases). In any event, even though these claims are reviewable, they are without merit.

Fifth Amendment's protections do not extend to aliens outside the territorial boundaries. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990). Because the Public Charge Pause applies only in the consular-processing context, and because the Fifth Amendment's equal protection does not extend to the noncitizens abroad, this claim fails. I will therefore grant summary judgment to the Government on Count Seven of the *Ivanov* complaint.

Plaintiffs' deprivation-of-funds theory similarly fails. The *Ivanov* plaintiffs argue that the adjustment-of-status plaintiffs "have paid money payments which is personal property protected by the Fifth Amendment," and that the Government has "deprived" them of that property by charging fees for applications that are indefinitely withheld. Ivanov Mem. at 30. Paying a filing fee does not create a protected property interest; at most, the fee secures access to the application process, not a vested entitlement to approval. Indeed, a noncitizen "does not have a right to a visa, or a constitutionally-protected interest in the procedures by which such visas are obtained." *Farooqui v. Dep't of State*, 2024 WL 1178468, at *7 (D.D.C. Mar. 19, 2024) (cleaned up). As such, plaintiffs point to no authority recognizing a property interest in the adjudication of an adjustment application, and the Court declines to create one here. Accordingly, I will grant summary judgment to the Government on Count Eight of the *Ivanov* complaint.

## VI. Remedy

"Vacatur is the normal remedy" when a court sets aside unlawful agency action under the APA. *Long Island Power Auth. v. Fed. Energy Regul. Comm'n*, 27 F.4th 705, 717 (D.C. Cir. 2022); *see* 5 U.S.C. § 706(2). Here, however, the parties agree that any

relief should be limited to the plaintiffs before the Court. *See* Ivanov Mem. II at 1 n.1 (reporting defendants' stipulation that any relief "should be strictly limited to those plaintiffs in this matter," with which plaintiffs do not disagree); Saito Reply at 18 ("The relief Plaintiffs seek is party-specific, and no universal remedy is required."); Chersak Reply at 19 (not objecting to "party-specific framing" and proposing an order directed to named plaintiffs' applications). That agreement accords with the governing equitable principles that the Court must "tailor the scope of relief to fit the challenged conduct and Plaintiffs' harms." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 803 F. Supp. 3d 164, 192 (D.D.C. 2025).

Accordingly, the Court will declare the State DV Pause, USCIS Pause, and Public Charge Pause unlawful as applied to the named plaintiffs in these consolidated actions and their derivative beneficiaries, and will enjoin defendants from applying those policies to their visa and adjustment-of-status applications.[25] The accompanying Order also directs the State Department, to the extent practicable, to take reasonable steps during the remainder of the DV fiscal year to reconsider applications refused solely under the State DV Pause or the Public Charge Pause, without applying either policy. USCIS must resume ordinary adjudication of covered named plaintiffs' pending adjustment applications without applying the USCIS Pause.[26]

---

[25] The Public Charge Pause has separately been vacated. *See Catholic Legal Immigration Network, Inc.*, 2026 WL 2455099, at *23. That development does not alter the party-specific relief ordered here, which independently resolves the claims of the named plaintiffs and their derivative beneficiaries.

[26] This relief is deliberately limited. It does not require defendants to reopen an application refused or denied on an independent ground; disregard any statutory, regulatory, or security-related requirement; or extend any applicant's statutory eligibility beyond September 30, 2026. Nor does it afford relief to persons who are not plaintiffs or derivative beneficiaries in these actions.

## CONCLUSION

For the foregoing reasons, I find that plaintiffs' motions for summary judgment are **GRANTED IN PART** and **DENIED IN PART**, and defendants' cross motions for summary judgment and motions to dismiss are **GRANTED IN PART** and **DENIED IN PART**. A separate Order consistent with this Memorandum Opinion will issue contemporaneously.

*/s/ Richard J. Leon*
RICHARD J. LEON
United States District Judge